IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SCOTT A. YEISLEY,             :
                                 :
        Plaintiff,           :
                                 :
        v.                 :
                                 :      No. 3:05-CV-01650
PENNSYLVANIA STATE POLICE; :
JEFFREY B. MILLER; CYNTHIA  :      (Judge McClure)
L. TRANSUE; SIDNEY A. SIMON; :
GOVAN A. MARTIN, III; JOSEPH :
T. MARUT; ROBERT L.        :
MURRAY; FRANK KOSCELNAK; :
ROBERT B. TITLER; and CARL  :
M. HARRISON, in their individual :
and/or official capacities,     :
                                 :
                                 :
        Defendants.      :

**MEMORANDUM**
November 18, 2010

# I. INTRODUCTION

The instant civil rights action, raised pursuant to 42 U.S.C. § 1983, was initiated by the filing of a complaint by plaintiff Scott A. Yeisley on August 12, 2005. (Rec. Doc. No. 1). In his complaint, Yeisley contends that the defendants violated the First, Fourth, and Fourteenth Amendments to the United States Constitution. The present defendants in the action are the Pennsylvania State Police ("PSP"); Commissioner Jeffrey B. Miller; Colonel Cynthia L. Transue;

Colonel Sidney A. Simon; Corporal Govan A. Martin, III; Captain Joseph T. Marut; Corporal Robert L. Murray; Major Frank Koscelnak; Captain Robert B. Titler; and Lieutenant Carl M. Harrison.  The instant action arises out of Yeisley's employment with the PSP.

Currently before this court is a motion for summary judgment filed by the defendants (Rec. Doc. No. 227) and a motion for partial summary judgment filed by plaintiff Yeisley (Rec. Doc. No. 226).  In light of the following, we will grant the defendants' motion for summary judgment and deny the plaintiff's motion for partial summary judgment.

## II.  PROCEDURAL HISTORY

On November 14, 2005, Major Koscelnak, Commissioner Miller, and Corporal Martin filed a motion to dismiss.  (Rec doc. No. 5).  After briefing (Rec. Doc. Nos. 8-10), the Honorable Thomas I. Vanaskie, the judge then assigned to the instant case,[1] denied the defendants' motion to dismiss on October 27, 2006. (Rec. Doc. No. 56).  Defendants Koscelnak, Miller, and Martin filed their answer to the plaintiff's complaint on December 20, 2006.  (Rec. Doc. No. 67).

Plaintiff subsequently filed his first motion for sanctions on January 23,

---

[1] The case was verbally reassigned to the undersigned judge on June 21, 2010, in light of Judge Vanaskie's elevation to the United States Court of Appeals for the Third Circuit.

2007. (Rec. Doc. No. 76). After briefing (Rec. Doc. Nos. 77, 107, and 113), the court, on March 31, 2008, granted the motion in part. (Rec. Doc. No. 132). On February 2, 2007, plaintiff filed a second motion for sanctions. (Rec. Doc. No. 91). After briefing by the parties (Rec. Doc. Nos. 92, 114, and 119), on March 31, 2008, the court denied the plaintiff's motion. (Rec. Doc. No. 133).

On December 18, 2009, plaintiff filed a stipulation of dismissal, pursuant to Fed. R. Civ. P. 41(a)(1)(ii) and concerning particular claims, entered into between the parties. (Rec. Doc. No. 206). First, the parties stipulated and agreed that the Fourteenth Amendment equal protection, substantive due process, and § 1983 conspiracy claims and the Fifth Amendment claims against Commissioner Miller, Colonel Transue, Colonel Simon, Corporal Martin, Captain Marut, Corporal Murray, Major Koscelnak, Captain Titler, and Lieutenant Harrison should be voluntarily dismissed. Id. at 1. Second, the parties stipulated and agreed that the plaintiff's Fourteenth Amendment procedural due process claim as against defendants Miller, Transue, Simon, Martin, Koscelnak, Titler, and Harrison should be voluntarily dismissed. Id. at 1-2.[2] Third, the parties agreed that the plaintiff's only claim as against the PSP, a claim raised under the Fair Labor standards Act, 8

_____

[2] The plaintiff's Fourteenth Amendment procedural due process claim therefore remains as to Captain Marut and Corporal Murray. See id. at 2.

3

U.S.C. § 201, et seq., should be voluntarily dismissed. Id. at 2.

On December 21, 2009, the defendants filed a stipulation of dismissal, also pursuant to Fed. R. Civ. P. 41(a)(1)(ii), in which the parties stipulated and agreed that those claims brought against Colonel Simon, Captain Marut, Corporal Murray, Major Koscelnak, Captain Titler, and Lieutenant Harrison in their official capacities should be voluntarily dismissed. (Rec. Doc. No. 207 at 1).[3]

On March 31, 2010, plaintiffs filed a motion for partial summary judgment, a requisite statement of material facts, and a brief in support. (Rec. Doc. Nos. 226, 232, and 235). On April 14, 2010, defendants filed a motion, with a brief in support, to strike the plaintiff's motion for partial summary judgment and supporting materials. (Rec. Doc. Nos. 239, 240). Plaintiffs filed a brief opposing the defendants' motion to strike on the same day (Rec. Doc. No. 242), and the defendants filed a reply brief relating to the motion to strike on May 3, 2010. (Rec. Doc. No. 247). After holding oral argument on the defendant's motion to strike the plaintiff's motion for partial summary judgment and supporting material on May 25, 2010 (see Rec. Doc. No. 251), the court granted the motion in part, to the extent that the court struck, without prejudice, the plaintiff's statement of

_____

[3] The plaintiff's individual capacity claims against these defendants remain. See id.

4

material facts.  (Rec. Doc. No. 252).

In accordance with the court's May 25, 2010 Order, the plaintiff filed a statement of material facts relating to the motion for partial summary judgment on June 7, 2010.  (Rec. Doc. No. 254).  Defendants filed a brief in opposition to the motion for partial summary judgment on August 5, 2010, as well as an answer to the plaintiff's re-filed statement of facts.  (Rec. Doc. Nos. 273 and 274).  On August 19, 2010, the plaintiff filed a reply brief.  (Rec. Doc. No. 277).  Also on August 19, 2010, the plaintiff filed a motion to supplement the record in support of the plaintiff's motion for partial summary judgment.  (Rec. Doc. No. 276).  On September 2, 2010, the plaintiff filed a brief in support of this motion to supplement the record.  (Rec. Doc. No. 279).[4]

Also on March 31, 2010, the defendants filed a motion for summary judgment, a statement of material facts, and a brief in support.  (Rec. Doc. No. 227, 231, and 233).  On May 3, 2010, plaintiff filed a brief in opposition to the defendants' motion for summary judgment, as well as his own statement of material facts and an answer to the defendants' statement of material facts.  (Rec.

---

[4] As the defendants have not filed a brief in opposition to the plaintiff's motion to supplement the record in support of his motion for partial summary judgment, we will deem the motion to be unopposed and grant the motion.  See Middle District Local Rule 7.6.

Doc. Nos. 244, 245, and 246).  On June 25, 2010, defendants filed a reply brief and a reply to the plaintiff's response to the defendants' statement of material facts.  (Rec. Doc. Nos. 265 and 266).

Both motions for summary judgment are now ripe for disposition.  As such, and in light of the following, we will grant the defendants' motion for summary judgment (Rec. Doc. No. 277) and deny the plaintiff's motion for partial summary judgment (Rec. Doc. No. 226).

## III.  FACTUAL BACKGROUND

The court first addresses the defendants' motion for summary judgment, as a determination in the defendants' favor would result in the dismissal of the entire action.[5]  Taken in a light most favorable to the non-moving party, plaintiff Yeisley, the salient facts are as follows.[6]

---

[5] Pursuant to Middle District Local Rule 56.1, the moving party is required to file a statement of material facts in support of the motion for summary judgment, and the non-moving party is required to file a responsive statement of facts.  Both parties are required to "include references to the parts of the record that support the statements."  A number of the plaintiff's factual assertions contained in his responsive statement of material facts are unsupported by references to the record; therefore, the court will adopt all of the defendants' facts not clearly disputed by the plaintiff with adequate references to the record.  See United States ex rel. Paranich v. Sorgnard, 286 F. Supp. 2d 445, 447 n.3 (M.D. Pa. 2003), aff'd, 396 F.3d 326 (3d Cir. 2005).

[6] Throughout the plaintiff's response to the defendants' statement of material facts, the plaintiff states as fact a number of inferences that are simply

## A. Trooper Yeisley's Arrival at the Dunmore Barracks

During the time period of relevance to the instant action, May of 2003, plaintiff Yeisley was a trooper with the Pennsylvania State Police at the Dunmore barracks.

On May 4, 2003, Trooper Yeisley arrived at the Dunmore barracks before his assigned shift, which was scheduled to begin at midnight. Upon his arrival, Trooper Yeisley was distraught - he was chain smoking, his hands were shaking, and he was visibly upset. In addition, Trooper Yeisley was armed with his personal weapon, which he was entitled to carry pursuant to PSP regulations. Trooper Yeisley spoke with PSP Corporal Edmund Fret concerning the stress he felt as the subject of a PSP criminal investigation. According to Trooper Yeisley, he "explained to Corporal Fret exactly what had occurred, everything in painful

_____

unreasonable. (See, e.g., Rec. Doc. No. 244) (". . . it can be inferred that Fret told others, and that Kugler told Martin who then told Transue who then told Miller . . . ."). As the defendants note, such inferences cannot be used to defeat the defendants' motion for summary judgment. See Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) ("[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). In paragraphs such as 11, 31, 45, 46, 50, 51, 53, 54, 56, 60, 61, 70, 71, 73, 83, 87, 105, 141, 158, 159, 161, 162, 169, and 171, as well as in other areas of the plaintiff's reply to the defendants' statement of material facts, the plaintiff makes unwarranted and unsupported inferential leaps. In these instances, the court will refrain from drawing such inferences and instead rely upon the facts as contained in the record.

detail during [the PSP's] investigation of [him]. . . . [He] told [Corporal Fret] who did it. [He] told [Corporal Fret] what they did. [He] told [Corporal Fret] when they did it. [He] told [Corporal Fret] where they did it. [He] told [Corporal Fret] who they did it with."  This detail, again, concerned the criminal investigation of Trooper Yeisley's alleged purchase, distribution, and use of drugs.

After Corporal Fret concluded that Trooper Yeisley would not be able to work his midnight shift, Fret recommended that Yeisley talk to a Member Assistance Program ("MAP") contact.  A MAP contact, Trooper Joseph Kugler, was requested to meet with Trooper Yeisley at the Dunmore barracks upon Yeisley's agreement with Corporal Fret's recommendation.  Corporal Fret and Trooper Yeisley waited together until the arrival of Trooper Kugler.  Based upon the recollection of Corporal Fret, Trooper Yeisley told Fret that, "if they didn't knock it off, he was going to go another route, whether file grievances or an unlabor [sic] practice or even a lawsuit or hostile work environment, something of that nature."

## B.  The MAP Session

At about 8:30 p.m., Trooper Kugler arrived at the Dunmore barracks to meet privately with Trooper Yeisley.

At the beginning of this MAP session, and pursuant to MAP procedure,

Trooper Yeisley was advised of the confidential nature of the session, and the ways in which such confidentially would be broken: (1) if a person is a clear and present danger to himself or herself; (2) if the person is a clear and present danger to others; (3) if a person committed, confesses to, or reveals details concerning a serious crime; or (4) if reporting is otherwise required by law. These confidentiality rules are according to PSP regulations. Yeisley also was informed that he should not use the names of individuals during the MAP session.

It appears clear that, during the MAP session, Trooper Yeisley made a statement that Trooper Kugler believed to be a threat to harm others. In fact, Trooper Yeisley acknowledges telling Trooper Kugler that Yeisley had "a meeting with Captain Marut on Wednesday . . . [and he] was afraid that [Captain Marut] was going to open his mouth and start saying some shit and [Yeisley] was going to snap and go right over the desk at [Captain Marut]." Although Kugler remembers Trooper Yeisley specifically mentioning Captain Marut's names, Yeisley does not believe he used any names, as Kugler had informed him at the beginning of the session that names should not be used.[7]

Upon Trooper Kugler's request for Trooper Yeisley to surrender his

_____

[7] It should be noted, though, that Trooper Yeisley does acknowledge referring to their rank. Only one PSP captain is stationed at the Dunmore barracks.

personal gun, Yeisley stated, "[Y]ou don't have to worry about me using a gun on him. I wouldn't use a gun anyway." Although Trooper Yeisley is unable to recall the exact content of what he said, he does admit stating something to the extent that, if he were to confront someone, he would not use a gun. Trooper Yeisley stated that he would prefer to use his hands or feel his hands around the other person's throat. In addition, Trooper Yeisley stated the following: "[I]f I did snap, God knows I might not stop by pounding him into the ground. I might go upstairs after the other idiots, too . . . ."[8]

During the MAP session, Trooper Yeisley also referred to the "blue door." In the Dunmore barracks, troopers and corporals in the patrol unit apparently are separated from those of higher ranks by a blue door. Trooper Yeisley has stated that he "didn't have a problem with everyone on the other side of the blue door. [He] had a problem with three people who worked at the Dunmore barracks . . . [and] it just so happened that all of those three people worked on the other side of the blue door." These three people were Captain Marut, Lieutenant Gilbert, and Sergeant Lavelle. Yeisley is unable to recall the exact number of times he made statements to this effect.

---

[8] Apparently the references to "other idiots" was meant to refer to Lieutenant Wanda Gilbert and Sergeant Mark Lavelle, who were also stationed at the Dunmore barracks.

During the MAP session, Trooper Kugler called MAP manager and SEAP coordinator, Commissioner Martin, informing Martin of the statements made by Trooper Yeisley and that the rules of confidentiality had been broken. Trooper Kugler informed Commissioner Martin that Trooper Yeisley had said that he wanted to put his hands around Captain Marut's neck and choke him. Martin provided Kugler with the name of a mental hospital for Yeisley.

## C. Trooper Yeisley's Transport to the Mental Hospital

In the early morning of May 5, 2003, Corporals Fret and Schultz transported Trooper Yeisley to the decided-upon mental hospital, located outside of State College, Pennsylvania. Trooper Yeisley does not remember the exact details of his conversation with Corporals Fret and Schultz. However, he does remember that he "summarized the whole mess from 2002 . . . right up to the point . . . where [he] was feeling lousy and [he] couldn't eat and [he] couldn't sleep and [he] was shaking like a leaf and [he] was needing help." Although Trooper Yeisley cannot remember anything further that was said during the trip, Corporal Schultz noted that Yeisley stated, during the trip, "I want to feel my hands around their throat." During the trip, Corporal Schultz informed Trooper Yeisley that he was assigned to conduct the criminal investigation.

At the time of the incident at Dunmore barracks, Sergeant Farrell was the

11

officer of the day. The officer of the day assumes the troop commander's duties beyond regular business hours; as such, Corporal Fret needed Sergeant Farrell's approval so as to bring a trooper in to cover Trooper Yeisley's shift. Corporal Fret notified Sergeant Farrell of the situation with Trooper Yeisley while Fret and Yeisley were waiting for Trooper Kugler to arrive. Commissioner Martin, as the MAP manager, called Sergeant Farrell several hours later and informed Farrell that Trooper Yeisley had made threats relating to a number of superior officers during a MAP session. As the officer of the day, it was Sergeant Farrell's responsibility to deal with the situation upon this notification. Sergeant Farrell called Corporals Fret and Schultz to come to the Dunmore barracks and transport Trooper Yeisley to the mental hospital.

Sergeant Farrell assigned Corporal Schultz to the criminal investigation stemming from the statements made by Yeisley during the MAP session. Because of this decision, Sergeant Farrell assigned to Corporal Schultz the task of transporting Trooper Yeisley to the mental hospital.

On May 4, 2003, Captain Marut was on leave, and Lieutenant Robert Evanchick was the acting captain and troop commander. Because of Lieutenant Evanchick's status on May 4, 2003, Sergeant Farrell informed Evanchick of the Yeisley incident. On the night of May 5, 2003, Lieutenant Evanchick notified

Major Koscelnak of the statements made by Trooper Yeisley.

Lieutenant Evanchick and Captain Marut testified that, upon Marut's return to work on May 5, 2003, Evanchick informed Marut of the threats made by Trooper Yeisley.

### D.  Assignment of the Investigation

Corporal Schultz apparently was "reticent" to undertake the criminal investigation of Trooper Yeisley's statements; however, the decision as to who should lead the investigation was up to Sergeant Farrell.  Although Corporal Schultz testified that he was told he was investigating a terroristic threats charge, the incident memo indicates that he was assigned to investigate a "disorderly conduct-other" charge.

Incident Memo #R01-0501355 was generated at or about 8:00 p.m. on May 4, 2003.  As noted above, Lieutenant Evanchick appears to have notified Captain Marut of the Yeisley incident on May 5, 2003, and Marut ordered Evanchick to generate an incident memorandum.  As such, Lieutenant Evanchick was temporarily listed as the investigating officer.  Captain Marut also ordered Sergeant Farrell to draft a Use of Force or Complaint Processing Worksheet ("BPR Worksheet") concerning the Yeisley incident.  This was done to begin an Internal Affairs Division ("IAD") investigation and, according to Captain Marut,

because Sergeant Farrell was at the Dunmore barracks the night of the incident and was familiar with the underlying facts. Sergeant Farrell appears to have decided on the content of the BPR Worksheet.

Later in the day on May 5, 2003, Captain Marut cancelled the first incident memorandum, #R01-0501355. Captain Marut informed Corporal Schultz, the investigating officer under the memorandum, that the IAD would in fact be conducting the investigation. Captain Marut ordered Corporal Schultz to complete a supplemental report which he was to provide to the IAD investigator.[9]

On May 15, 2003, Corporal Murray was assigned to internally investigate BPR #2003-0319. Captain Marut did not participate in the decision to assign Corporal Murray as the IAD investigator.

## E.  Investigation

As noted above, Corporal Murray was assigned to internally investigate the incident involving Trooper Yeisley that occurred on May 4, 2003. As part of this investigation, Corporals Fret and Schultz, Sergeant Farrell, Corporal Martin, Lieutenant Gilbert, and Trooper Kugler were interviewed. Corporal Schultz also provided a supplemental report, and Trooper Kugler provided a victim/witness

---

[9] There is no evidence in the record supporting the conclusion that anyone other than Marut participated in the decision to assign the Yeisley investigation to the IAD.

statement and an additional statement. Corporal Murray attached the incident

memorandum to his report.

During the criminal investigation, Murray did not interview Yeisley.

According to PSP regulations, it was not required that Corporal Murray interview

Trooper Yeisley during a criminal investigation. During the administrative

investigation, and pursuant to PSP regulations, Corporal Murray did attempt to

interview Trooper Yeisley. The defendants contend that Trooper Yeisley refused

the interview, while Yeisley contends that he "submitted to the interview," though

it is unclear what plaintiff means by this statement.

## F. Criminal Charges Against Trooper Yeisley

On July 15, 2003, Corporal Murray sent his criminal investigative report,

for a decision on prosecution, to the District Attorney's Office for Lackawanna

County. Pursuant to IAD standard practice, Murray did not send with the report

the Kugler interview audiotape.

The District Attorney's Office approved the filing of harassment and

terroristic threat charges against Trooper Yeisley on July 30, 2003. On or about

August 12, 2003, Corporal Murray filed the criminal complaint and affidavit of

probable cause charging Trooper Yeisley with harassment and making terroristic

threats. In the affidavit of probable cause, the statements attributed to Trooper

Yeisley were drawn from Trooper Kugler's second written statement and Corporal Schultz's supplemental report. According to Corporal Murray, at the time he filed the above-referenced criminal charges, he believed that such charges were supported by probable cause.

Based upon Corporal Murray's affidavit of probable cause, the District Justice, on August 12, 2003, approved the charges and issued subpoenas to Captain Marut, Corporal Schultz, and Trooper Kugler.

Also on August 12, 2003, Corporal Murray delivered the Schultz and Marut subpoenas to the Dunmore barracks, providing the required information to Trooper Charles Sands, the Troop R Public Information Officer.[10] As the charges concerned only misdemeanor offenses, Trooper Yeisley was never arrested, i.e. physically taken into custody. On or about August 12, 2003, a Commonwealth Law Enforcement Assistance Network message was sent, addressed to Commissioner Miller, Colonel Transue, and Lieutenant Titler, informing these individuals of the charges filed against Trooper Yeisley.

However, the preliminary hearing scheduled for September 9, 2003, was never held. The above charges were dismissed on November 17, 2003, after a

---

[10] There is no evidence before the court that any defendants knew of the filing of the criminal charges until they were actually filed.

hearing was held on November 12, 2003, following the filing of a writ of habeas corpus by trooper Yeisley. The PSP received notice of this dismissal on December 12, 2003.

## G.  The IPEs and Trooper Yeisley's Duty Status

On May 7, 2003, Captain Marut requested that Trooper Yeisley undergo an Independent Psychiatric Examination ("IPE"). This request was made through Major Koscelnak and before Trooper Yeisley was released from the mental health facility. There is no evidence in the record indicating that Marut did not believe the truthfulness of anything contained in the IPE request.

On May 12, 2003, Major Koscelnak supported Captain Marut's IPE request. Koscelnak's concurrence was based upon (1) Marut's description of Trooper Yeisley's threats, and (2) the information contained in Marut's IPE request. Plaintiff has pointed to no evidence in the record that would call into question Major Koscelnak's belief that the information in either his or Captain Marut's IPE was accurate. On June 18, 2003, Trooper Yeisley was informed that he was to undergo an IPE.

On June 20, 2003, Trooper Yeisley underwent an IPE, which was performed by Dr. Roger Cadieux. Dr. Cadieux concluded that Trooper Yeisley was not fit to return to work. On July 23, 2003, Trooper Yeisley received a written order that

directed him to seek counseling with a psychologist or psychiatrist of his own

choosing. In addition, he was directed to have his psychologist or psychiatrist

provide monthly reports to the PSP's psychologist, Dr. Larry Walker. Trooper

Yeisley refused to sign this order.

Trooper Yeisley filed Grievance Nos. R-114 and R-115 with the

Commonwealth's Labor Arbitration Tribunal, which the Tribunal stamped

received on August 1, 2003. With these filings, Trooper Yeisley grieved his

removal from duty as a PSP trooper.

The Arbitrator ruled on these grievances on June 14, 2005. Pursuant to the

Arbitrator's ruling, Trooper Yeisley was to be given the opportunity to start

counseling with a psychiatrist or psychologist, of his own choosing, who would

provide monthly reports to the PSP psychologist. Trooper Yeisley's fitness for

duty was to be determined by an independent evaluator upon the recommendation

of Yeisley's treating psychologist or psychiatrist and the agreement of the PSP

psychologist. Should Trooper Yeisley be found fit for duty, he would be entitled

to return with full seniority. Also, according to the Arbitrator's ruling, if Trooper

Yeisley were to comply with the above, he would be put on "leave without pay

status"; however, as of the date of the Arbitrator's award, his healthcare benefits

would be reinstated. Trooper Yeisley, on June 30, 2005, provided the name of his

chosen psychologist, Dr. Michael A. Church. Thereafter, the PSP began to receive monthly progress reports from Dr. Church on Trooper Yeisley from August 11, 2005, through December 5, 2005.

Dr. Louis Laguna, an independent psychologist, evaluated Trooper Yeisley on December 6, 2005, and determined that Yeisley was fit for duty. On January 27, 2006, Trooper Yeisley was informed that he could return to duty.

### H. Trooper Yeisley's Suspension Without Pay

Trooper Yeisley was suspended without pay, pending the resolution of the criminal charges filed against him, on August 14, 2003. These criminal charges were dismissed on November 17, 2003. The suspension without pay was rescinded on October 25, 2004, and was made retroactive, dating back to August 15, 2003, the date on which the criminal charges were filed.

Trooper Yeisley elected to use paid leave until his leave was depleted, beginning on September 24, 2004. In fact, he received paychecks from September 10, 2004, through June 17, 2005, totaling nineteen checks for an amount of $24,862.96; however, Trooper Yeisley cashed none of these checks.

### I. Trooper Yeisley's Discipline

The collective bargaining agreement ("CBA") between the PSP and the Pennsylvania State Troopers Association ("PSTA") covering the years 2000 to

2004, in addition to other applicable laws and regulations, delineates the procedures to be followed when disciplining a member of the PSP.

Article 26 of the CBA, _inter alia_, provides, "If the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated."  The CBA, however, also states that "the time limits may be waived by the Department upon a showing of just cause or by mutual agreement of both parties."  Article 28 of the CBA provides for a grievance procedure through which an individual may challenge the discipline received.  When an individual is unavailable for military reasons, medical reasons, or fitness for duty reasons, the PSP has consistently waived time limits related to imposing discipline.  Such waivers have been upheld by grievance arbitrators.

Disciplinary Action Reports ("DARs") are initiated by either area or trooper commanders.  The commissioner has the power to assign a person other than an area or troop commander to initiate a DAR.  Discipline based upon the issuance of a DAR is issued by the Department Disciplinary Officer or the Assistant Disciplinary Officer.

IAD #2003-0961 was initiated by Captain Marut because Trooper Yeisley did not provide the requisite monthly reports from his psychologist and, on March 9, 2004, Marut issued DAR 04-39, concerning IAD #2003-0961.  On April 27,

2004, concerning the conduct underlying IAD #2003-0961, Lieutenant Harrison issued a three-day suspension without pay against Trooper Yeisley. This discipline was never vacated, the criminal charges against Trooper Yeisley were dismissed on November 17, 2003, and the PSP received notice of such dismissal on December 12, 2003.

The PSP deemed Trooper Yeisley unavailable to be interviewed for IAD #2003-0319, the administrative investigation, as Yeisley was off work because of fitness for duty purposes. On May 13, 2004, Colonel Simon issued DAR 04-73 to Trooper Yeisley, thereby adjudicating IAD #2003-0319. There is no evidence that Captain Marut played a role in Colonel Simon's adjudication of IAD #2003-0319. Trooper Yeisley was suspended without pay on September 16, 2004, in light of the conduct underlying IAD #2003-0319.

Although Trooper Yeisley contends that the discipline should not have been imposed, this discipline was never vacated.

## J. Trooper Yeisley's Unemployment Compensation Claim and Appeals

Trooper Yeisley filed a claim for unemployment compensation benefits on January 4, 2004. He was determined eligible for unemployment compensation benefits, retroactive to January 10, 2004, on January 27, 2004.

The PSP appealed this decision, and a telephonic hearing was held on

March 26, 2004, before Referee William Ogan.  On April 8, Referee Ogan reversed the allowance of benefits, concluding that Trooper Yeisley was ineligible for such benefits due to willful misconduct.

Trooper Yeisley appealed this decision on April 16, 2004.  On June 21, 2004, the referee's decision was affirmed by the Unemployment Compensation Board of Review.

Trooper Yeisley appealed the Unemployment Compensation Board of Review's decision to the Pennsylvania Commonwealth Court on August 17, 2004.  The Commonwealth Court, on September 13, 2004, remanded the case to the Board of Review so that the Board could conduct a hearing and reconsider its decision based upon additional testimony and evidence.

The PSP, on December 14, 2004, stipulated that Trooper Yeisley's unemployment, for the period of time concerned, occurred because of his medical condition.  In light of this stipulation, the Board of Review granted Trooper Yeisley's request for unemployment compensation benefits, a decision which was not appealed by the PSP.

## V.  STANDARD OF REVIEW

Summary judgment is appropriate when 1) there are no material facts in dispute; and 2) one party is entitled to judgment as a matter of law.  Int'l Union,

United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir. 1990) (citing Fed. R. Civ. P. 56(c)).

A district court may properly grant a motion for summary judgment "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit.  Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004).

Regardless of who bears the burden of persuasion at trial, the party moving for summary judgment has the burden to show an absence of genuine issues of material fact.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996) (citations omitted).  To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'"  Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see Celotex Corp. v. Catrett, 477 U.S. 317,

23

323 (1986). More simply put, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim. Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that a issue of material fact remains. Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact. Celotex, 477 U.S. at 32; Anderson, 477 U.S. at 252; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## V.  DISCUSSION

### 1.  Plaintiff Yeisley's First Amendment Retaliation Claim

Defendants first contend that they are entitled to summary judgment on Trooper Yeisley's First Amendment retaliation claim. (Rec. Doc. No. 233 at 33-45). For a plaintiff to prove a claim of retaliation for the exercise of his or her First Amendment rights, a plaintiff must meet a two-part test. First, a plaintiff

must prove that the First Amendment protects the activity at issue.  See Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) (citing Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)).  Second, a plaintiff must prove "that the protected activity was a substantial factor in the alleged retaliatory action."  Id.

To determine whether an activity is protected under the First Amendment, the activity must meet a three-part test.  First, in making the statement, the public employee must speak as a citizen.  Id.  Second, the statement must relate to a matter of public concern.  Id.  Third, the employer, a government entity, must not have had "an adequate justification for treating the employee differently from any other member of the general public" because of the statement made.  Id. at 241-42 (citing Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

The defendants concede that Trooper Yeisley's statements indicating that he intended to file a lawsuit constitute speech  protected under the First Amendment. (Rec. Doc. No. 233).[11]  However, the defendants contend that any adverse actions taken by them against Trooper Yeisley - such as Yeisley's suspension without pay, those criminal charges that were eventually filed against him, the initiation of the

---

[11] The defendants do argue that the verbal complaints Trooper Yeisley made concerning his alleged mistreatment by the PSP and his being the subject of the criminal investigation in 2002 do not constitute protected speech under the First Amendment.  Id.

two IADs and DARs, and the discipline he received from the PSP - were not motivated by protected activity.  Id. at 49-52.[12]

Plaintiff Yeisley, in response, contends that all of the defendants were personally involved in the alleged constitutional violations.  (Rec. Doc. No. 246). Plaintiff also contends that "[t]he timing of the criminal investigations and IPE requests prove it was retaliation" and that "all were done the same day or within a week of [Trooper Yeisley's] protected activities."  Id.  In addition, plaintiff claims that the defendants, during their criminal investigation of him, failed to comply with regulations AR 4-25, OM 7-2, and FR 7-1.  Id. at 13.  Plaintiff also contends that further evidence of wrongdoing also exists in "the failure [of the defendants] to either order [him] in 2003 to continue to seek help with MAP *or* to voluntarily get help from SEP which provided up to three free sessions."  Id. (emphasis included).  Plaintiff also argues that defendants Miller, Transue, Martin,

_____

[12] The defendants also argue that several contentions by Trooper Yeisley simply do not constitute adverse actions, such as the failure of Colonel Simon, Corporal Martin, Captain Titler, and Lieutenant Harrision to begin further internal investigations; Corporal Murray's IAD investigation; and Captain Marut and Major Koscelnak's recommendations that Yeisley undergo an IPE.  Id. at 47-49. We agree with the defendants that these actions are not "'more than *de minimis* or trivial'" and therefore cannot properly be considered to have adversely affected Trooper Yeisley's First Amendment rights.  See Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003).  As such, we will grant the defendants' motion for summary judgment as to these defendants to the extent that the plaintiff relies upon these actions as constituting adverse actions.

Koscelnak, and Simon "all hid behind a policy of not properly supervising subordinates . . . ." Id.

At the outset, we note that the plaintiff's First Amendment retaliation claims against defendants Miller, Transue, and Koscelnak must fail, as these claims are based upon respondeat superior. According to traditional Third Circuit precedent, supervisory personnel are only liable under § 1983 if they participated in or had knowledge of violations, if they directed others to commit violations, or if they had knowledge of and acquiesced in subordinates' violations. Baker v. Monroe Twp., 50 F.3d 1186, 1191 (3d Cir. 1995). However, with its decision in Ashcroft v. Iqbal, the United States Supreme Court may have cast doubt on the viability of this standard for holding government officials liable based on a theory of supervisor liability under § 1983. In Iqbal, the Supreme Court noted that, "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. at 1948. The Court also emphasized that "[i]n a § 1983 suit or a Bivens action - where masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Id. at 1949.

Various courts of appeals, including the Third Circuit, have recognized the potential effect that Iqbal may have in altering the standard for supervisor liability in a Bivens or a § 1983 suit. See, e.g., Bayer v. Monroe County Children and Youth Servs., 577 F.3d 186, 190 n.5 (3d Cir. 2009) (noting that, in light of Iqbal, "it is uncertain whether proof of . . . personal knowledge [concerning a Fourteenth Amendment violation of procedural due process], with nothing more, would provide a sufficient basis for holding [the defendant] liable with respect to plaintiffs' Fourteenth Amendment claims under § 1983"); Maldonado v. Fontanes, 568 F.3d 263, 274-75 n.7 (1st Cir. 2009) (noting that "recent language from the Supreme Court may call into question our prior circuit law on the standard for holding a public official liable for damages under § 1983 on a theory of supervisory liability").

Regardless of the standard used, however, we conclude that Commissioner Miller, Colonel Transue, and Major Koscelnak are entitled to summary judgment as to the plaintiff's First Amendment retaliation claim. The plaintiff has failed to point to any evidence supporting the claim that these three defendants had any personal involvement, knowledge or otherwise, in the adverse actions taken against him. As such, we will grant the defendants' motion for summary judgment as to the plaintiff's First Amendment retaliation claims against defendants Miller,

28

Transue, and Koscelnak.

As to defendants Simon, Martin, Titler, Harrison, Marut, and Murray, we similarly conclude that these defendants are entitled to summary judgment as to the plaintiff's First Amendment retaliation claim. First, as to Colonel Simon, Trooper Yeisley claims that the discipline he received resulting from Simon's adjudication of IAD #2003-0319 and issuance of DAR 04-74 was untimely and that, in light of the issues concerning IAD #2003-0319, Simon should have begun his own investigation. (Rec. Doc. No. 233 at 45). We agree with the defendants that there is simply no evidence of a link between those actions plaintiff alleges Colonel Simon undertook and the statements made by Trooper Yeisley indicating his intention to sue. Second, as to the suspension of Trooper Yeisley's employment with the PSP without pay, there is no evidence supporting the conclusion that this suspension was made by anyone involved to retaliate against the plaintiff for his stated intention to file a lawsuit. In fact, every indication points to the suspension occurring as a result of the criminal charges being filed against Trooper Yeisley. Third, there is no evidence that Captain Marut's initiation of the two IADs at issue - IAD #2003-0319 and IAD #2003-0691 - was in any way done so as to retaliate against Trooper Yeisley for his intent to sue. Fourth, there is no evidence supporting the conclusion that the criminal charges

filed against Trooper Yeisley after the investigation conducted by Corporal

Murray was in any way motivated by the fact that Yeisley stated his intention to

file a lawsuit. Finally there is no evidence that the discipline issued by Lieutenant

Harrison concerning IAD #2003-0691 and #2003-0319 was in any way motivated

by retaliatory reasons.

Trooper Yeisley, as noted above, has attempted to create genuine issues of

material fact by drawing inferential leaps and assumptions where none are

warranted. These inferences are not tied to the record. At the summary judgment

stage, more is warranted than has been provided by the plaintiff. Quite simply, a

jury could not reasonably find in favor of the plaintiff as to his First Amendment

claim against the above defendants, based upon that evidence in the record. As

such, we conclude that defendants Simon, Martin, Titler, Harrison, Marut, and

Murray are entitled to summary judgment as to the plaintiff's First Amendment

retaliation claim.

### 2. Plaintiff Yeisley's First Amendment Access to Courts Claim

An individual alleging a denial of access to the courts must show actual

injury, meaning actual prejudice or the actual denial of access to the courts. See

Lewis v. Casey, 518 U.S. 343, 350 (1996); Bounds v. Smith, 430 U.S. 817 (1977).

As the Supreme Court has noted, "[t]he right that Bounds acknowledged was the

[already well-established] right of *access to the courts*." Lewis, 518 U.S. at 350 (emphasis in original) (citing Bounds, 430 U.S. at 817, 821, and 828); see also Peterkin v. Jeffes, 855 F.2d 1021, 1039-40 (3d Cir. 1988).

In the instant case, we fail to see how Trooper Yeisley has alleged a valid access to the courts claim or how the evidence in the record would, in any way, support such a claim. No injury suffered by Trooper Yeisley is apparent; in fact, Yeisley prevailed in the criminal case against him and has since initiated this lawsuit. As such, we will grant the defendants' motion for summary judgment as to the plaintiff's First Amendment access to courts claim.[13]

### 3. Plaintiff Yeisley's Fourth Amendment Malicious Prosecution Claim

Defendants also contend that they are entitled to summary judgment on plaintiff Yeisley's Fourth Amendment malicious prosecution claim. The elements of a malicious prosecution claim alleged under the Fourth Amendment and pursuant to § 1983 are as follows:

1) the defendant initiated a criminal proceeding;
2) the defendant did so in the absence of probable cause;
3) the criminal proceeding ended in favor of the plaintiff;
4) the defendant acted with malice 'or for a purpose other than

---

[13] Although the plaintiff filed a brief in opposition to the defendants' motion for summary judgment, he does not address in this brief the defendants' contention that they are entitled to summary judgment as to his First Amendment access to courts claim. (Rec. Doc. No. 246).

> bringing the plaintiff to justice'; and
>
> 5) as a result of the criminal proceeding, 'the plaintiff suffered a deprivation of liberty consistent with the concept of seizure.'

Kokinda v. Breiner, 557 F. Supp. 2d 581, 591 (M.D. Pa. 2008) (Caputo, J.) (citing Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007)). As the Third Circuit has noted, "'prosecution without probable cause is not, in and of itself, a constitutional tort.' The type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution itself." DiBella v. Borough of Beachwood, 407 F.3d 599, 602-603 (3d Cir. 2005) (quoting Gallo v. City of Philadelphia, 161 F.3d 217, 224 (3d Cir. 1998)) (internal citations omitted).

Here, we conclude that the defendants are entitled to summary judgment as to the plaintiff's Fourth Amendment malicious prosecution claim. The plaintiff has failed to bring forward any evidence that, as a result of the criminal proceeding, "the plaintiff suffered a deprivation of liberty consistent with the concept of seizure." Kokinda, 557 F. Supp. 2d at 591. The plaintiff claims that he "has shown deprivation of liberty both with and without due process - publication of the charges via PSP press release and appearance at the Court hearing November 12, 2003." (Rec. Doc. No. 246 at 39) (internal citations omitted). However, neither of these alleged deprivations amounts to a seizure for purposes

of the Fourteenth Amendment.  See Burke v. Twp. of Cheltenham, 2010 U.S. Dist.

LEXIS 106206, at *27 (E.D. Pa. Oct. 5, 2010) (concluding that the plaintiff failed

"to allege that this prosecution resulted in any deprivation of his liberty as Knorr

requires" and that, therefore, the actions that the plaintiff alleged the defendant

engaged in did not deprive the plaintiff "of a federally protected right"); see also

Hanks v. County of Delaware, 518 F. Supp. 2d 642, 651 (E.D. Pa. 2007) ("Mere

attendance at a trial or a hearing does not qualify as a Fourth Amendment

seizure.") (citing DiBella, 407 F.3d at 603).  As such, plaintiff has failed to point

to any evidence that would support an actionable malicious prosecution claim

raised pursuant to § 1983.  Therefore, we will grant the defendants' motion for

summary judgment as to this claim.

**4.  Plaintiff Yeisley's Fourteenth Amendment Procedural Due Process Claim**

Plaintiff also raises a Fourteenth Amendment procedural due process claim

against Corporal Murray and Captain Marut.  With this claim, it appears as though

Trooper Yeisley contends that, during his criminal investigation, Corporal Murray

violated PSP regulations and the plaintiff's Fourteenth Amendment procedural due

process rights.  Plaintiff also appears to claim that Captain Marut should be held

liable (1) for violating the plaintiff's procedural due process rights based upon the

failure of Corporal Murray to interview him before Murray's report was provided

to the District Attorney, and (2) for Murray's failure to include an audiotape of

Trooper Kugler's interview with those materials provided to the District Attorney.

As the plaintiff has failed to demonstrate the personal involvement of Captain

Marut in Corporal Murray's investigation, this claim will be dismissed.[14]  Pursuant

to our discussion below, we will similarly dismiss the plaintiff's procedural due

process claim against Corporal Murray, as Murray is entitled to summary

judgment as to this claim.

An official will be entitled to qualified immunity if the official did "not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In

Saucier v. Katz, the Supreme Court mandated a two-step analysis concerning

qualified immunity.  533 U.S. 194 (2001).  First, a court must decide whether the

facts alleged, taken in the light most favorable to the party asserting the injury,

show that the officer's conduct violated a constitutional right.  Id. at 201.  Second,

a court must decide whether that right was clearly established.  Id.  "The contours

of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  Id. at 202.

Recently, the Supreme Court held that the "rigid order of battle" outlined in

_____

[14] See supra, Part V(1).

34

_Saucier_ is not a mandatory requirement. See _Pearson v. Callahan_, 555 U.S. 223 (2009). Lower courts now can use their discretion to decide which of the two prongs to consider first. _Id._ at 818.

Here, the plaintiff appears to contend that, because Corporal Murray allegedly violated PSP regulations, the plaintiff's procedural due process rights were similarly violated. It appears clear to this court that PSP regulations did not mandate that Trooper Yeisley be interviewed during the criminal investigation and that Yeisley had no constitutional right to such an interview. In addition, the failure to include the audiotape of the Kugler interview neither violated the plaintiff's constitutional rights nor PSP regulations; instead, the factual record supports the conclusion that such audiotapes were not typically sent to the District Attorney for the purposes of prosecutorial discretion. We therefore conclude that Corporal Murray is entitled to qualified immunity, as the factual record, taken in the light most favorable to Trooper Yeisley, shows that Murray's conduct did not violate Yeisley's constitutional rights. See _Saucier_, 533 U.S. at 201. At the very least, if in fact Yeisley's constitutional rights were violated by Corporal Murray, such rights clearly were not established at the time of their alleged violation in

2003.[15]

## 5. Plaintiff's Claims Against Defendants Miller, Transue, and Martin in Their Official Capacities for Monetary Relief

Plaintiff also seeks monetary relief against defendants Miller, Transue, and

Martin in their official capacities.  The Supreme Court has held that "a suit against

a state official in his or her official capacity is not a suit against the official but

rather is a suit against the official's office."  Will v. Mich. Dep't of State Police,

491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)).  The

Court went on to note that, as such, an official capacity suit against a state official

"is no different from a suit against the State itself."  Id. (citing Kentucky v.

Graham, 473 U.S. 159, 165-66 (1985)).  In light of the above, state officials are

not properly considered to be "persons" under § 1983, just as states are not

considered to be persons and are entitled to Eleventh Amendment immunity.

Because of this fact, we must conclude that defendants Miller, Transue, and

Martin are entitled to summary judgment to the extent that the plaintiff sues them

in their official capacities for monetary relief, as each is entitled to Eleventh

---

[15] The court again notes that the plaintiff, in his opposing brief, has failed to address the defendants' motion for summary judgment with respect to his Fourteenth Amendment procedural due process claim against Murray and Marut.

Amendment immunity.[16]

### 6. Plaintiff's Request for the Application of Spoliation Inferences

In his brief filed in opposition to the defendants' motion for summary judgment, the plaintiff also asks for the application of spoliation inferences. (Rec. Doc. No. 246 at 4). There is no motion to compel filed by the plaintiff with this court through which the plaintiff seeks additional evidence from the defendants; instead, the plaintiff has raised the issue of spoliation of evidence only in his brief in opposition to the defendants' motion for summary judgment. "Summary judgment is not the appropriate procedural mechanism for resolving discovery disputes." Shipe v. Haverford Twp., 2010 U.S. Dist. LEXIS 13702, at *10-11 n.3 (E.D. Pa. Feb. 16, 2010) (citing Reyes v. Hannah, 2000 U.S. Dist. LEXIS 1494, at *1 (E.D. Pa. Feb. 17, 2000)). As such, the court will not consider the request, contained in the plaintiff's opposition brief, for an adverse inference.

## VI. CONCLUSION

In light of the above, we will grant the defendants' motion for summary judgment. (Rec. Doc. No. 227). Therefore, all of the plaintiff's claims against the defendants will be dismissed, and the case will be closed. As the defendants are

---

[16] Additionally, the plaintiff has failed to address the defendants' motion for summary judgment with respect to his official capacity suit against defendants Miller, Transue, and Martin.

entitled to summary judgment as to all of the plaintiff's claims, we also will deny

the plaintiff's motion for partial summary judgment.  (Rec. Doc. No. 226).

   s/ James F. McClure, Jr.   
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT A. YEISLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 3:05-CV-01650 |
| PENNSYLVANIA STATE POLICE; | : | |
| JEFFREY B. MILLER; CYNTHIA | : | (Judge McClure) |
| L. TRANSUE; SIDNEY A. SIMON; | : | |
| GOVAN A. MARTIN, III; JOSEPH | : | |
| T. MARUT; ROBERT L. | : | |
| MURRAY; FRANK KOSCELNAK; | : | |
| ROBERT B. TITLER; and CARL | : | |
| M. HARRISON, in their individual | : | |
| and/or official capacities, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**ORDER**

November 18, 2010

Now, therefore, in accordance with the accompanying memorandum, **IT IS**

**HEREBY ORDERED THAT:**

1.    Plaintiff's motion for partial summary judgment (Rec. Doc. No. 226)

      is **DENIED**;

2.    Defendants' motion for summary judgment (Rec. Doc. No. 227) is

      **GRANTED**;

3.    The clerk is directed to enter final judgment in favor of all defendants

      and against plaintiff, as to all claims not voluntarily dismissed; and

4.    The clerk is directed to close the case file.

                                        ___s/ James F. McClure, Jr._____
                                        James F. McClure, Jr.
                                        United States District Judge